FILED

07/08/2026

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 15, 2026 Session

## RODNEY HARBACK v. EDDIE'S BODY SHOP, LLC ET AL.

**Appeal from the Chancery Court for Roane County**
**No. 2018-66      Tom McFarland, Chancellor[1]**
_____

**No. E2025-00447-COA-R3-CV**
_____

This appeal arises from a breach of contract lawsuit following the sale of a body shop business. Prior to the sale, the owner entered into a paint-purchasing agreement requiring him to purchase $900,000 worth of paint over time in exchange for discounts and up-front "pre-bate" payments. Under the paint-purchasing agreement, the paint supplier could terminate the agreement if the business was sold without the supplier's prior written consent. The owner later sold his business to buyers pursuant to an asset purchase agreement whereby the buyers agreed to take on the business's paint-purchasing obligations. The buyers initially kept buying paint from the same supplier but eventually stopped. The paint supplier demanded repayment of the up-front funds from the prior owner under his personal guarantee. The prior owner then sued the buyers, asserting that they were required to hold him harmless. The buyers filed a counterclaim asserting that the prior owner committed the first breach by selling the business without the paint supplier's consent, resulting in the buyers never receiving the expected value of the deal. The trial court ruled in the prior owner's favor. The buyers appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, P.J., E.S., and WILLIAM E. PHILLIPS II, J., joined.

Sharon Reynolds Clark and Sara Newcomb Lawson, Kingston, Tennessee, for the appellants, Eddie's Body Shop, LLC, Adam Clark, and Brandon Moore.

George R. Arrants and Hilary L. Magacs, Knoxville, Tennessee, for the appellee, Rodney Harback.

_____

[1] Chancellor Frank V. Williams, III, originally presided in this matter. In August 2022, while the matter remained pending, Chancellor Williams was defeated for re-election.

# OPINION

## BACKGROUND

Before April 2017, Rodney Harback ("Plaintiff") owned and operated Eddie's Body Shop (the "Business" or "Collision Center"), a sole proprietorship. On May 31, 2016, Plaintiff and PPG Industries, Inc. ("PPG") entered an agreement (the "PPG Contract") whereby Plaintiff would exclusively purchase PPG paint through PPG's intermediary—or "jobber"—Tasco Auto Color #24 ("Tasco"). Under the PPG Contract, Plaintiff was to purchase $900,000 worth of PPG paint for the Business over time. Meanwhile, as an incentive or "pre-bate," Plaintiff received $140,000 from PPG and $15,000 from Tasco. The PPG Contract provided, as relevant:

> 9.1 *Termination Events*. If, at any time during the Term: (a) Collision Center is in default or breach of the terms or conditions of this Agreement and such default is not remedied within thirty (30) days after written notice of such default or breach is delivered by PPG or Servicing Jobber to Collision Center; . . . (e) Collision Center sells substantially all of its assets or business to another person or entity without the prior written consent of PPG and Servicing Jobber; . . . (each of (a) through (g) above, a "***Termination Event***"), then PPG shall have the right, at its option, to immediately terminate this Agreement and shall have no further obligation hereunder.

> \*\*\*

> 11. **Assignment**. This Agreement is not assignable by Collision Center or Owner, in whole or in part, without the prior written consent of PPG and Servicing Jobber (which consent shall not be unreasonably withheld) and any attempted assignment without such consent, whether by operation of law or otherwise, shall be void. . . .

In addition, Plaintiff was required to personally guarantee the PPG Contract, such that he would be required to pay back the money provided to him up-front if the minimum purchase obligation was not met.

Several months after executing the PPG Contract, Plaintiff took steps to sell the Business. On January 17, 2017, Plaintiff, as seller, and Adam Clark ("Mr. Clark"), Brandon Moore ("Mr. Moore"), and Eddie's Body Shop, LLC,[2] as buyers (together, "Defendants"), executed the Asset Purchase Agreement (the "APA"). The purchase price

---

[2] Eddie's Body Shop, LLC is an entity that was created to facilitate the purchase of Plaintiff's assets.

was $2,000,000.00. On March 31, 2017, the sale closed. As pertinent to this appeal, the APA contained several key terms in Paragraphs (1), (8), (12), and (16), as follows:

**1. ASSETS TO BE TRANSFERRED AND CONVEYED**
On the Closing Date, as that term is defined in Section 5 of this Agreement, subject to the terms and conditions set forth herein, Seller hereby agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following assets:

\*\*\*

c. All of Seller's rights under an existing contract with P.P.G. Paint. Said contract is a five-year contract to purchase paint, with approximately four years remaining. Buyer covenants and agrees to perform all remaining obligations imposed on Seller by said contract and hold Seller harmless therefrom.

\*\*\*

**8. SELLER'S REPRESENTATIONS AND WARRANTIES**

Seller represents and warrants to Buyer as follows:

a. Seller has full power and authority to execute, deliver and perform its obligations under this Agreement, the instruments required hereby, and any other agreements and instruments contemplated by this Agreement. Seller has all requisite power and authority to own its properties and assets, including the Assets (as defined herein), and to conduct its business as now conducted. Seller is qualified to do business in all jurisdictions where it is required to do so and has all necessary permits and authorizations required to carry out Seller's Business.

b. The execution and delivery of this Agreement, the instruments required hereby, and the other agreements and instruments contemplated by this Agreement have been duly authorized by all necessary actions of Seller and by anyone else whose approval or authorization is required. Upon execution and delivery, this Agreement, the instruments required hereby, and the other agreements and instruments contemplated by this Agreement will be legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

c. The execution and delivery of this Agreement does not, and the execution and delivery of the instruments required hereby and other agreements and

- 3 -

instruments contemplated by this Agreement will not, and the consummation of the transactions contemplated hereby and thereby will not (i) violate any provision of law or any order, judgment or decree of any court or other governmental or regulatory authority applicable to Seller; (ii) violate or result in a breach of, an acceleration under, or constitute a default under, any contract, lease, loan agreement, mortgage, security agreement, or other agreement or instrument to which Seller is a party or by which it is bound or to which any of Seller's properties or assets is subject, which would prevent Seller from transferring any of the Assets in the manner and as contemplated by and in accordance with the terms and provisions of this Agreement; or (iii) result in the imposition of any liens or restrictions on Seller's Business or any of the Assets.

***

f. Seller shall have and convey at the Closing good and marketable title to all of the Assets free and clear of all liens, pledges, security interests and encumbrances.

***

m. Neither the representations and warranties of Seller contained herein nor in any certificate, Exhibit, inventory statement, income statement, balance sheet, cash flow statement or other financial statement, delivered to Buyer pursuant hereto or in connection with the sale of the Assets, contain any untrue statement of a material fact or, taken together, omit to state a material fact necessary in order to make the statements herein and therein not misleading.

***

## 12. INDEMNIFICATION

a. Seller agrees to defend, indemnify and hold Buyer harmless from and against, any and all claims, causes of action, damages, expenses, taxes, assessments, interest, penalties, judgments, and costs, including reasonable attorney fees, incurred directly or indirectly by Buyer arising out of or in any way connected with:

(i) Breach of any of the representations, warranties, covenants and agreements of Seller set forth in this Agreement, the instruments required hereby, or any instrument or agreement delivered in connection with this Agreement;

***

b. Buyer agrees to defend, indemnify and hold Seller harmless from and against, any and all claims, causes of action, damages, expenses, taxes, assessments, interest, penalties, judgments, and costs, including reasonable attorney fees, incurred directly or indirectly by Seller arising out of or in any way connected with:

***

(iii) The business responsibilities, expenses, costs and liabilities of Buyer, including but not limited to the following:

***

(d) All obligations arising on and after the Closing Date regarding the aforesaid P.P.G. Paint contract and any other contracts assigned by Seller to Buyer;

***

**16. REMEDIES**

Subject to the other provisions of this Agreement, in the event of a breach of any provision of this Agreement, the non-breaching party shall be entitled to reasonable attorney fees, costs and expenses incurred for the enforcement of said provisions, in addition to damages for the breach thereof. The remedies set forth in the Agreement shall be cumulative, and no one shall be construed as exclusive of any other or of any remedy provided by law, and the failure or delay of any party to exercise any remedy at any time shall not operate as a waiver of the right of such party to exercise any remedy for the same or subsequent default at any time thereafter.

After the Business was sold, a legal dispute soon arose between Plaintiff and Defendants over the paint-buying obligation under the PPG Contract. On May 11, 2018, Plaintiff filed a complaint in the Roane County Chancery Court (the "trial court") against Defendants. Plaintiff alleged that Defendants had stopped buying PPG products; that PPG notified Plaintiff of the PPG Contract's termination and demanded repayment; and that, as a result, Plaintiff repaid PPG. Plaintiff sought to recover from Defendants the sum he repaid to PPG, alleging breach of the APA and interference with contractual and business relations.

On June 11, 2018, Defendants filed an answer and counterclaim. Defendants stated that Plaintiff had essentially kept them in the dark before closing by restricting their ability to talk to vendors. Defendants stated further that they were not provided with a separate valuation for the PPG Contract obligation. Defendants also asserted that, in a July 26, 2017 letter, PPG notified Plaintiff that the PPG Contract was terminated based on his assignment of the contract without PPG's prior written consent, a material breach of the PPG Contract. In their counterclaim, Defendants asserted that, "[a]s a direct and proximate result of [Plaintiff's] breach of the representations and warranties as set out in the [APA], [Defendants] have incurred monetary damages due to the loss of the purported valuable assets agreed to be conveyed, but unable to be conveyed by [Plaintiff] to [Defendants]," for which Defendants sought damages, attorney's fees, costs, and expenses.[3]

On July 26, 2018, Plaintiff filed an answer to Defendants' counterclaim. In his answer, Plaintiff asserted that the PPG Contract was "identified, described, and available" to Defendants, but they simply never asked to see it. Plaintiff asserted further that Defendants were pursuing a new paint supplier well before PPG raised an issue of Plaintiff's alleged breach of the PPG Contract. Plaintiff also raised several affirmative defenses, such as estoppel and unclean hands.

On November 8, 2019, Defendants filed a motion for summary judgment. In February 2020, Plaintiff filed his response. On March 11, 2020, the trial court entered an order denying Defendants' motion, finding that there were sufficient disputed facts for trial. On October 27 and 28, 2020, this case was tried.

Daniel Harman ("Mr. Harman"), a retired PPG territory manager, testified first. Mr. Harman participated in negotiating the PPG Contract with Plaintiff. When Plaintiff later sold the Business to Defendants, Mr. Harman found out after the fact. Mr. Harman said that this was a departure from normal practice. Nevertheless, PPG allowed the PPG Contract to continue as Defendants initially kept buying PPG paint and Plaintiff remained a personal guarantor. According to Mr. Harman, Defendants inquired about discounts and even wanted their own PPG agreement, but this was impossible so long as the original contract was active. Mr. Harman explained that, for one, he needed to do his due diligence as to Defendants' creditworthiness in order for PPG to have a contractual relationship with them. Mr. Harman testified that, instead, Defendants told him that they were opting for a new paint supplier. Mr. Harman explained:

> That's -- when they said they were going to look at other options, that they were going to change paint lines, that's what they were going to do. They were going to look and see what else was out there. There's a lot of paint

<hr/>

[3] Defendants also filed a third-party complaint against The Title Insurance of Chattanooga, Inc., a matter which later was resolved between these parties and dismissed by the trial court with prejudice.

manufacturers with the same program. All major automobile paint manufacturers have a body shop purchase agreement.

Consequently, Mr. Harman asked PPG to issue a termination letter to Plaintiff. In the interim, whatever paint Defendants bought from PPG was credited on a dollar-for-dollar basis toward Plaintiff's remaining obligation, and PPG's pricing terms remained the same during this period.

In a July 26, 2017 letter entered into the record as an exhibit at trial, counsel for PPG wrote Plaintiff informing him that he was in material breach of the PPG Contract and demanding repayment, stating in part as follows:

> You are in material breach of your obligations under Sections 9.1(e) and 11 of the [PPG Contract] (a copy of which is enclosed for your reference) by failing to obtain PPG's prior written consent to your attempted assignment of the [PPG Contract] to [Defendants]. Accordingly, pursuant to Sections 9.1 and 9.2(a) of the [PPG Contract], PPG hereby terminates the [PPG Contract] and demands repayment in the amount of **$140,000.00**. Please note that Jobber may have independent claims against you under the [PPG Contract] that are not addressed by this letter.

Defendants continued buying PPG paint through mid-August 2017. Mr. Harman told Defendants that they were free to buy paint from whichever company they liked because they had no contract with PPG, and PPG could not contract with Defendants so long as the PPG Contract with Plaintiff was in effect. Questioned about Defendants' continued purchase of PPG paint through mid-August 2017, Mr. Harman stated that "[y]ou don't change paint lines overnight" and "there's a lot more involved with that."

Following Mr. Harman's testimony, Plaintiff took the stand. Plaintiff testified that he told Defendants they were required to keep buying PPG paint. For Plaintiff, Defendants' agreement to take on this obligation was crucial to the sale. Defendants' acceptance of the paint-buying obligation was also a basis for Plaintiff reducing the sale price of the Business from $2.8 million to $2 million. Plaintiff testified:

> Q. In connection with the $2.8 million sale price, did you negotiate a reduction?
> A. I did. I agreed to take $2 million.
> Q. Why did you do that?
> A. Just got to looking and I thought, well, maybe I was a little high on it, so I come down on the price.
> Q. Were there deal factors that you considered and relied on in your agreeing to reduce the purchase price?
> A. Not really, I mean, other than they had to fulfill the PPG. They

had to buy PPG paint for four and a half years or I wouldn't have sold the property, or I would have raised the price back up at least a quarter of a million dollars to cover --

Q. Why? Why would you --

A. I was going to --

Q. -- raise it?

A. -- owe $140,000 plus interest, not to them, but if they paid it off in payments it would have been $140,000 plus 20 years of interest. So I would have added probably 200,000 at least to the cost of the property.

Q. Did you consider the buyer's agreement to perform the PPG paint purchase contract obligations that you had after they bought the business as a --

A. I expected them to buy PPG paint. That was our agreement, you know. If they entered into a new contract -- the PPG contract was me.

Q. And then you had a separate contract --

A. With them.

Q. -- with them.

A. That said they would buy PPG paint to keep my butt out of the sling.

Q. And by that, what do you mean?

A. Well, I would have to pay the $140,000 out of my pocket if they didn't fulfill that agreement. And I wouldn't have sold the shop had they not agreed to it. We wouldn't be here.

Regarding his willingness to share information with Defendants, Plaintiff testified:

Q. At any time prior to the closing or at the closing were there any questions asked of you regarding the PPG --

A. No, sir.

Q. -- paint contract?

A. I would have gladly answered them had they asked.

Q. Now, subsequent to the closing did Mr. Clark or Mr. Moore or anyone for the buyers contact you with questions about any of the operations of Eddie's Body Shop?

A. No, sir. They come in that day and said they were done with me, and I could go.

Regarding the $140,000 he received up-front from PPG, Plaintiff testified that he used much of that for the Business, such as for new equipment and improvements. Plaintiff stated further that Defendants had the ability to review the PPG Contract but never asked to see it. Ultimately, Plaintiff borrowed against his life insurance policies to pay PPG $85,000 on its repayment demand. As a result, Plaintiff sought reimbursement from Defendants under the indemnification clause of the APA.

Plaintiff emphasized that he told Defendants they were obligated to keep buying PPG paint, and he believed they understood this. Plaintiff testified that he thought his actions improved the value of the Business and that Defendants benefited from the PPG Contract, such as by receiving up to 17% in discounts on paint. Plaintiff stated that he did not intend to transfer the PPG debt to Defendants; he only wished to transfer his obligation to buy PPG paint. On recross examination, Plaintiff acknowledged that invoices did not reflect a 17% discount on paint and that Tasco had no written documentation of any such discounts. Plaintiff also acknowledged that the PPG Contract is described as an asset in the APA.

Next to testify was Greg Leffew ("Mr. Leffew"), an attorney hired by Plaintiff to revise a draft sales agreement to include the PPG Contract. At the time, Mr. Leffew was not furnished a copy of the PPG Contract. In late June 2017,[4] Mr. Leffew was contacted by Plaintiff or Plaintiff's wife when PPG raised issues involving the sale of the Business and the implications for the PPG Contract. Mr. Leffew communicated with PPG's counsel and was told a credit application was needed to approve any assignment. Mr. Leffew informed Mr. Clark, who in turn told Mr. Leffew, that he had "worked out another agreement to purchase paint."

The trial court then heard Mr. Clark's testimony. Mr. Clark stated that Plaintiff had touted the PPG Contract as an exclusive opportunity with "extra discounts and rebates." Mr. Clark acknowledged that he had an obligation to buy PPG paint, but he also believed at the time that Plaintiff had the authority to do what he did. Mr. Clark said that he did not review the PPG Contract before the sale and instead took Plaintiff's word for it. Mr. Clark continued buying PPG paint through mid-August 2017 when he first bought paint from another vendor. According to Mr. Clark, at a July 27, 2017 meeting with PPG and Tasco representatives, he learned that he was no longer obligated to buy PPG paint and that he could apply for a new contract. Mr. Clark denied that Mr. Leffew had previously asked him to fill out a credit application. According to Mr. Clark, his prior communications with Mr. Leffew involved a request from the latter to "backdate" certain documents, not a request about PPG approval. Mr. Clark testified that he only switched vendors after believing he had fulfilled his obligations to Plaintiff.

At this point, Mr. Harman was recalled for further testimony. Mr. Harman reiterated that, sometime in July 2017, Defendants told him that they were going to stop buying PPG paint. The trial court questioned Mr. Harman as follows:

> THE COURT: Let me revisit something here that I was wondering about. There was some discussion with [Defendants] about filling out a credit application so that they can have their own contract with PPG as opposed to anything that [Plaintiff] had with PPG --

---

[4] The witnesses at trial were sometimes uncertain as to the precise dates for key events in the case.

THE WITNESS: Correct.

THE COURT: -- correct? But [Defendants] had been buying paint from PPG or from Tasco without any contract between PPG and themselves, right?

THE WITNESS: Correct.

THE COURT: Could that have continued?

THE WITNESS: Sure.

THE COURT: And at the same price and on the same terms?

THE WITNESS: Nothing would change. Their agreement with [Plaintiff] we assumed was the best deal for them. It was an unusual situation, and I was just trying to make the best use of an unusual situation. A great deal of work had already taken place and it was easier for me, just to be honest with you, just to continue doing business. I could --

THE COURT: And so who brought that up? Was that brought up by PPG -- brought up by you on behalf of PPG or Tasco, or how did that come up?

THE WITNESS: I don't understand the question.

THE COURT: The possibility, or even the need, however you would describe it, of their having their own contract for which they would need to submit their own credit application and that sort of thing.

THE WITNESS: Well, they asked me.

THE COURT: They what?

THE WITNESS: They asked me if that could happen, if they could get their own contract, and I explained to them I couldn't have a contract with the body shop with [Plaintiff's] name and theirs at the same time.

THE COURT: Yes. I remember you saying that yesterday.

THE WITNESS: But was it possible, yes. But the way they were purchasing now was kind of through [Plaintiff's] agreement and their agreement with him. If I got the credit app, I would run it through and say, okay, you either qualify or you don't qualify and we would go forward from there.

THE COURT: And about when did that conversation take place?

THE WITNESS: Oh, my gosh. Probably June, somewhere in that neighborhood.

THE COURT: So that was in June, then the termination letter was in July. They continued to buy paint up until August?

THE WITNESS: Uh-huh.

THE COURT: And in August Tasco, you say, came and got their equipment, and that was that?

THE WITNESS: That was the end of that. Probably sent them a final bill for what was missing out of consignment. Other than that, I would assume that would be the end of it.

- 10 -

After Mr. Harman's additional testimony, Mr. Clark returned to the stand. Mr. Clark testified that he never received the discounts that Plaintiff said came with the PPG contract and that Tasco never showed any documentation of such discounts. Mr. Clark testified further that, following his switch from using PPG paint, he entered into a new contract with another supplier. On the question of how long it took to set up an exclusive paint-purchasing agreement with a new paint supplier, Mr. Clark said it could take "probably about a week," and is a "little bit of a hassle." Mr. Clark was asked whether he had understood clearly that he agreed with Plaintiff to continue buying PPG paint regardless of whether the PPG Contract was characterized as an asset:

> Q. That provision -- or that claim states that [Plaintiff] either intentionally or negligently misrepresented this contract as a, quote, asset, when the same should have been characterized as a, quote, liability of the business.
> A. Okay.
> Q. In your negotiations with [Plaintiff] and in your negotiations that resulted in the purchase agreement and signing the purchase agreement and closing, you weren't confused about what obligation the PPG [C]ontract represented? It was a paint purchase obligation that you were going to continue to perform. I mean that's accurate, right?
> A. That's what we agreed to.
> Q. You weren't confused about it, even though it was characterized as an asset?
> A. We understood that it was a purchase obligation, yes.
> Q. And [Plaintiff] had actually identified that to you as the only obligation that he had that he was passing through to you as the new owner. Is that accurate?
> A. That is accurate, yes.
> Q. And he satisfied that by way of paying off any other debts and obligations of the business. I think you have mentioned there might have been a Yellow Pages bill that you got that maybe you shouldn't have or something.
> A. That was not included in our agreement, but that's all been taken care of, so.
> Q. So he basically didn't leave you with any debt other than this purchase obligation?
> A. That is correct, yes. The business was free and clear.
> Q. Okay. And you didn't rely on any valuation of the PPG paint contractual arrangement or the obligation to buy paint, you didn't rely on any dollar value of that -- from that as far as whether you did or didn't close the purchase or negotiate any different terms regarding the purchase, did you?
> A. No, sir. That didn't affect any terms of negotiation.

- 11 -

Returning to the subject of discounts promised, Mr. Clark testified that the value of the PPG Contract would have been $90,748.15 had he received the discounts and rebates indicated. Regarding his understanding of PPG's actions against Plaintiff, Mr. Clark testified:

Q. And in your countercomplaint there was discussion about you didn't know, or you had not received that July 26th letter when you stopped purchasing paint in August?

A. Correct.

Q. But Mr. Harman told you that they were terminating, correct?

A. He told us that they were going after Mr. -- they had proceeded with legal action against [Plaintiff], and we asked -- we specifically asked them, you know, what -- if we sign a contract with you guys, what is that going to do, and they told us that that legal action was already in progress. There was nothing that we could do at that point. So if we signed with them --

Q. It didn't make any difference?

A. We could have signed a contract with PPG and they still would have went after [Plaintiff] is what they explained to us.

After the witness testimony concluded, the trial court found that Plaintiff breached the PPG contract by failing to obtain prior written consent for the sale of the Business from PPG and Tasco but that the breach was harmless to Defendants as PPG kept selling them paint. The trial court concluded further that Defendants anticipatorily repudiated their obligation under the APA to continue buying PPG paint by expressing their intention to use a different paint supplier, which caused PPG to terminate the PPG Contract and demand repayment from Plaintiff. The trial court thus ruled in Plaintiff's favor and reserved issues of attorney's fees and costs.

On January 19, 2021, before the trial court entered its written judgment, Defendants filed a motion for additional findings of fact. After a hearing, the trial court denied Defendants' motion and instructed the parties to submit proposals for a judgment. On October 1, 2021, the trial court entered its written judgment. The trial court found that, while Plaintiff breached the representations and warranties of the APA by selling the Business without prior consent from PPG, this breach was harmless to Defendants because PPG allowed them to keep buying paint. The trial court determined that Defendants had agreed in the APA to hold Plaintiff harmless on obligations arising out of the PPG Contract. The trial court found further that, in July 2017, Defendants repudiated their obligation to keep buying PPG paint when they told PPG that they wanted to go with another paint supplier. This caused PPG to terminate the PPG Contract and seek repayment of the $140,000 pre-bate from Plaintiff, with Plaintiff ultimately paying PPG $85,000. The trial court held Defendants liable for breach of the APA; ordered them to reimburse Plaintiff for the $85,000 payment plus interest on his life insurance policy loans; and awarded Plaintiff

reasonable attorney's fees and expenses to be determined at a later date. The trial court dismissed Defendants' counterclaim with prejudice.

Plaintiff subsequently sought discretionary costs, while Defendants filed a motion to alter or amend and for additional findings. In November 2021, following a hearing, the trial court denied Defendants' motion while granting Plaintiff's requests for discretionary costs and attorney's fees. So as not to interfere with Plaintiff's ability to recover attorney's fees under the APA, the trial court also ruled that its judgment should be amended to remove any reference to Plaintiff's failure to obtain prior consent from PPG, finding that this was not material to Plaintiff's breach of contract claim.[5] In December 2021, the trial court entered orders granting Plaintiff discretionary costs and attorney's fees.

On June 30, 2022, then-sitting Chancellor Frank V. Williams, III, signed an older proposed order instead of the amended judgment he ordered. Both sides moved to set aside the order, but the issue went unresolved for about a year. In June 2023, Plaintiff renewed his request to set aside the order, and Defendants responded. In September 2023, the new judge presiding over the case, Chancellor Tom McFarland, set aside the 2022 order and reinstated the original October 2021 judgment as written.

Defendants then filed another motion to alter or amend and for additional findings. On May 7, 2024, the trial court heard Defendants' motion. On March 5, 2025, the trial court entered an order denying Defendants' motion. Chancellor McFarland determined in his order that, given the procedural circumstances of the case, Defendants' renewed motion was timely and proper. Nevertheless, because Chancellor McFarland had neither presided over the trial nor heard the witnesses testify, he concluded that he could not amend Chancellor Williams' findings. On April 2, 2025, Defendants timely appealed to this Court.

---

[5] At the November 2021 hearing, the trial court addressed counsel for Defendants, stating in part:

THE COURT: Okay. I will say again, [Plaintiff] was not in breach; did not cause the breach of the contract between him and [Defendants]. [Defendants] caused it. It was exclusively the conduct of [Defendants] that resulted in the termination of the sale of PPG paint to [Defendants]. . . . [If the finding of Plaintiff's breach] prevents your clients from being responsible to [Plaintiff], then I'll just amend the judgment to take that out, because I have told you that I don't think that had anything to do with it. It just provides the backdrop against which your client[']s breach of [Plaintiff's] contract came about.

- 13 -

We restate and consolidate Defendants' issues on appeal as follows:

1. Whether the trial court erred in concluding that Plaintiff did not attempt to assign the PPG Contract to Defendants.

2. Whether the trial court erred in declining to find that Plaintiff's failure to obtain PPG's prior written consent constituted a material breach of the APA.

3. Whether the trial court erred in finding that Defendants anticipatorily repudiated the APA.

4. Whether the trial court erred in awarding attorney's fees to Plaintiff.

5. Whether the trial court committed substantive and procedural errors requiring reversal or remand.

**STANDARD OF REVIEW**

As stated by our Supreme Court,

> In a non-jury case such as this one, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. [*Id.*]

*Kelly v. Kelly*, 445 S.W.3d 685, 691–92 (Tenn. 2014). We defer to a trial court's assessment of witness credibility absent clear and convincing evidence to the contrary. *Id.* at 692. Clear and convincing evidence eliminates any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* at 692–93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)). Insofar as the abuse of discretion is implicated, a trial court abuses its discretion when it "applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *In re Estate of Greenamyre*, 219 S.W.3d 877, 886 (Tenn. Ct. App. 2005).

DISCUSSION

## I. Whether Plaintiff attempted to assign the PPG Contract to Defendants

The trial court concluded, among other things, that Plaintiff did not attempt to assign the PPG Contract to Defendants in the APA. The trial court noted that the word "assignment" does not appear in Paragraph 1(c) of the APA where Plaintiff's rights under the PPG Contract are identified as an asset to be transferred and conveyed. On appeal, Defendants argue that the trial court erred in concluding that Plaintiff did not intend to assign the PPG Contract through the APA. The crux of Defendants' argument on this issue is that Plaintiff had no authority to assign the PPG Contract; that Plaintiff nonetheless attempted to assign the PPG Contract through the APA; that the attempted assignment was void from the beginning; and that therefore Defendants owe Plaintiff no duties arising from the PPG Contract.

In general, a court's role in interpreting a contract is to ascertain the intention of the parties. "The intention of the parties is based on the ordinary meaning of the language contained within the four corners of the contract. The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness." *MLG Enters., LLC v. Johnson*, 507 S.W.3d 183, 186 (Tenn. 2016) (quoting *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)). Under Tennessee law, an "assignment" is a transfer of property or right. *Action Chiropractic Clinic, LLC v. Hyler*, 467 S.W.3d 409, 411 (Tenn. 2015). As our Supreme Court has explained:

> For an assignment to be valid, it "must contain clear evidence of the intent to transfer rights, must describe the subject matter of the assignment, must be clear and unequivocal, and must be noticed to the obligor." 6 Am.Jur.2d *Assignments* § 82. Moreover, the intent of the assignor to transfer the right must be "manifest." *Collier v. Greenbrier Developers, LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009) (quoting E. Allan Farnsworth, *Contracts* § 11.3, p. 709 (3d ed. 1999)). In determining whether the assignor has demonstrated such a manifest intent, the Court shall consider "all the circumstances, including works and other conduct." 6 Am.Jur.2d *Assignments* § 82. "[A]n equitable assignment is precluded when the property subject to the equity is not definitely pointed out so that it may be distinguished and identified." *Id*. § 85.

*Id*. at 412. As for determining intent to assign,

> [t]he owner may manifest this intention directly to the assignee or to a third person. No words of art are required; the assignor need not even use the word *assign*. Whether the owner of a right has manifested an intention to

transfer it is a question of interpretation to be answered from all the circumstances, including words and other conduct.

*Collier v. Greenbrier Devs., LLC*, 358 S.W.3d 195, 201 (Tenn. Ct. App. 2009) (quoting E. Allan Farnsworth, *Contracts* § 11.3, p. 709 (3d ed.1999)). When an assignment is effective, the assignee "stands in the shoes" of the assignor, with all the rights and obligations of the assignor. *Id.*

In support of their contention that Plaintiff attempted to assign the PPG Contract through the APA, Defendants cite language in the APA whereby Plaintiff conveyed the "Seller's rights under an existing contract with P.P.G. Paint . . . [and the Buyers' indemnification of the Seller against] [a]ll obligations arising on and after the Closing Date regarding the aforesaid P.P.G. Paint contract and any other contracts *assigned* by Seller to Buyer." (Emphasis added). Defendants argue that, based on both the language of the APA and Plaintiff's trial testimony, Plaintiff clearly and unambiguously intended to assign the PPG Contract to Defendants. Defendants assert that since the PPG Contract contained a provision against assignment without PPG's prior written consent, and Plaintiff failed to obtain that consent, his attempted assignment was void from the beginning. Defendants also cite the APA's description of the PPG Contract as an "asset." Defendants contend further that the trial court erred by not interpreting the APA according to its four corners. In addition, Defendants argue that, inasmuch as the APA is ambiguous, it should be construed against Plaintiff as the drafter. *See Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003) ("[W]hen a contract contains ambiguous or vague provisions, these provisions will be construed against the party responsible for drafting them.").

According to Plaintiff, the conduct at issue is more akin to delegation than assignment. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 295 (Tenn. 2011) ("The delegation of performance, however, does not relieve the contractor from the duties implicit in the original contract."). Plaintiff argues that the APA reflects that he only intended to delegate the paint-purchasing obligations to Defendants, not assign the PPG Contract as a whole. Plaintiff points to language in the APA in which Defendants covenanted and agreed to perform the remaining obligations under the PPG Contract and hold Plaintiff harmless therefrom. Plaintiff also points to the parties' conduct. Finally, Plaintiff notes his trial testimony in which he said that he would remain personally liable to PPG, as well as Mr. Clark's testimony that he had no confusion about his obligation to keep buying PPG paint.

Based on the plain terms of the APA, as well as the evidence from trial regarding the parties' conduct, we conclude that Plaintiff did not manifest a clear and unambiguous intent to assign the PPG Contract to Defendants. While the APA refers to assignment, it does not do so in Paragraph 1(c), where Plaintiff's rights under the PPG Contract are identified as an asset to be transferred and conveyed. Moreover, the indemnification

language favors Plaintiff. The central thrust of the APA is transferring the performance of remaining obligations under the PPG Contract to Defendants rather than the PPG Contract as a whole. This reflects delegation rather than assignment. The parties' conduct reinforces the trial court's conclusion that no attempted assignment occurred. Instead, the evidence strongly supports that Defendants understood they had an obligation to keep buying PPG paint. The whole point of Defendants' agreement to fulfill the paint-buying obligation was to keep Plaintiff from owing money to PPG on the PPG Contract. Defendants' agreement to buy PPG paint was a crucial term in the negotiations between Plaintiff and Defendants in the first place. Plaintiff reduced the sale price of the Business on grounds that Defendants would keep buying PPG paint. As Plaintiff testified, had Defendants not agreed to do this, he would not have sold the Business to them. Meanwhile, Plaintiff remained personally liable to PPG if Defendants failed to keep buying PPG paint. Clearly, at the heart of the parties' deal was that Defendants would assume the paint-buying obligations to protect Plaintiff from having to repay PPG and to lower the sale price for the Business, not that Plaintiff would convey to Defendants the PPG Contract as a whole. Insofar as the inquiry over assignment concerns the parties' conduct and the evidence adduced at trial, the evidence does not preponderate against the trial court's factual findings. The trial court also saw and heard the witnesses testify, and the trial court's credibility determinations, both implicit and explicit, are entitled to deference. *See Kautz v. Berberich*, No. E2019-00796-COA-R3-CV, 2021 WL 1034987, at *7 (Tenn. Ct. App. Mar. 18, 2021). Under all the circumstances of this case, Plaintiff delegated his paint-buying obligation; he did not attempt to assign the PPG Contact as a whole. We affirm the trial court on this issue.

## II. Whether Plaintiff materially breached Paragraph 8 of the APA by misrepresenting his authority

Next, Defendants argue that Plaintiff materially breached the warranties in Paragraph 8 of the APA by falsely representing that he had the authority to transfer the PPG Contract; that Plaintiff also falsely represented that doing so would not violate any existing agreement; and that Plaintiff's breach constituted a failure of a condition precedent to Defendants' performance because they required an effective assignment to perform. To make a prima facie claim that an express warranty was breached, "a plaintiff must prove that: (1) Seller made an affirmation of fact intending to induce the buyer to purchase the goods; (2) Buyer was in fact induced by the seller's acts; and (3) The affirmation of fact was false regardless of the seller's knowledge of the falsity or intention to create a warranty." *Body Inv., LLC v. Cone Solvents, Inc.*, No. M2006-01723-COA-R3-CV, 2007 WL 2198230, at *7 (Tenn. Ct. App. July 26, 2007). There appears to be no serious dispute that Plaintiff breached the express warranty of the APA by selling the Business without PPG's prior written consent. The dispute concerns the materiality of the breach. As for what constitutes a material breach, this Court has stated:

To determine whether a breach is material, Tennessee looks to Section 241 of the Restatement (Second) of Contracts. *Adams TV of Memphis, Inc. v. ComCorp of Tenn.*, 969 S.W.2d 917, 921 (Tenn. Ct. App. 1997) (citing *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn.App. 1990); Restatement (Second) of Contracts § 241 (1981)). The following are the factors in determining whether a breach is material:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241.

*Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 225–26 (Tenn. Ct. App. 2009). Regarding the consequences of a material breach, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. Thus, in cases where both parties have not fully performed, it is necessary for the courts to determine which party is chargeable with the first uncured material breach." *United Brake Sys., Inc. v. Am. Env't Prot., Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997) (quoting *McClain v. Kimbrough Const. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)).

Tracking the factors contained in Restatement (Second) of Contracts § 241, Defendants assert that they were deprived of the benefit of their bargain in the form of PPG Contract rights, including discounts and rebates; that they never received the rights they were due to begin with; that Plaintiff's forfeiture stemmed from his own lack of authority to convey the PPG Contract; that Plaintiff could not cure his failure because he could not convey the PPG Contract from the start; and that the trial court put undue emphasis on Plaintiff's good faith compared to other factors. Defendants argue further that Plaintiff's failure to get PPG's prior written consent was a condition precedent to their ability to perform.

In response, Plaintiff argues that there was no material breach because there was no evidence that Defendants were deprived of any expected benefit, and Defendants stopped buying PPG paint before they could benefit from rebates; that all Defendants had to do was

keep buying PPG paint; that Plaintiff faced major forfeiture since Defendants' agreement to take on the paint-buying obligation was vital to him reducing the sale price of the Business; that, although he could not cure his failure to obtain PPG's consent, he remained personally liable to PPG, and an effective assignment was impossible because Defendants declined a credit check; and that, as to his good faith, Plaintiff never hid anything from Defendants, and Defendants never even relied on the PPG Contract in their negotiations. As to Defendants' argument that PPG's consent was a condition precedent, Plaintiff argues that the issue is waived because Defendants never pled it and that it fails regardless because Defendants were never prevented from buying PPG paint.

We conclude that, to the extent Plaintiff breached the APA by falsely representing that he had the authority to convey the PPG Contract, such breach was of no meaningful consequence to Defendants. Defendants lost no real benefit since PPG continued selling them paint on the same terms. Conversely, deeming Plaintiff's breach of contract material would result in significant forfeiture for him, as the entire arrangement with Defendants depended on their agreeing to buy PPG paint so he would not have to repay PPG. Furthermore, Plaintiff's breach was essentially cured since PPG continued to sell paint to Defendants, thus the latter could go on performing even after PPG learned about the sale. Plaintiff was also transparent with Defendants. Plaintiff was prepared to answer Defendants' questions about the PPG Contract, but Defendants never asked. Defendants' failure to conduct due diligence does not detract from Plaintiff's good faith. That Defendants simply chose not to look at the PPG Contract before closing was not Plaintiff's fault. The Restatement factors favor Plaintiff.

Regarding failure of a condition precedent, we disagree with Plaintiff that Defendants waived this issue by failing to raise it below. Defendants raised this theory in their summary judgment briefing. All the same, it is of no avail to Defendants. Defendants were never prevented from fulfilling their obligation to buy PPG paint. This obligation never hinged on Plaintiff obtaining consent from PPG to convey the PPG Contract. Indeed, throughout this case, Defendants have placed greater weight on compliance with the PPG Contract than PPG itself did. The PPG Contract was between Plaintiff and PPG; Defendants were not a party to it. PPG went on selling its paint to Defendants despite Plaintiff selling the Business. This situation could have carried on indefinitely. Defendants could have adhered to their paint-buying obligation; PPG would go on selling its paint to Defendants; and Plaintiff would not owe PPG. As found by the trial court, Defendants unilaterally chose a different path. Whatever breach Plaintiff committed by selling the Business without PPG's prior written consent was between him and PPG; it did not excuse Defendants' obligation under the APA to keep buying PPG paint and to hold Plaintiff harmless for that obligation. We conclude that Plaintiff's breach of the APA was non-material and of no moment to Defendants.

## III. Anticipatory Repudiation

Defendants argue that the trial court erred in finding that they anticipatorily repudiated the APA. The Tennessee Supreme Court has explained anticipatory repudiation as follows:

> A party to a contract can take certain actions or make certain statements that repudiate it. Such a repudiation can occur when a party "commit[s] a voluntary act which renders the party unable or apparently unable to perform the contract," *Wright v. Wright*, 832 S.W.2d 542, 545 (Tenn. Ct. App. 1991); *see Restatement (Second) of Contracts* § 250 (1979), or when "the words and conduct of the contracting party . . . amount to a total and unqualified refusal to perform the contract." *Wright*, 832 S.W.2d at 545; *see Ky. Home Mut. Life Ins. Co. v. Rogers*, 196 Tenn. 641, 270 S.W.2d 188, 194–95 (1954); *Brady v. Oliver*, 125 Tenn. 595, 147 S.W. 1135, 1139 (Tenn. 1911); *Wilkins v. Third Nat. Bank in Nashville*, 884 S.W.2d 758, 761 (Tenn. Ct. App. 1994). An indication that more negotiations are sought is not a total and unqualified refusal to perform. *See Palmiero v. Spada Distr. Co.*, 217 F.2d 561, 565 (9th Cir. 1954) (holding that "an anticipatory breach of contract is not established by a negative attitude or one which indicates that more negotiations are sought").

> When a repudiation occurs before the time that a contract requires a party to perform, the repudiating party has committed an "anticipatory repudiation" or an "anticipatory breach" of the contract. *See Church of Christ Home for Aged v. Nashville Trust Co.*, 184 Tenn. 629, 202 S.W.2d 178, 183 (1947); 23 Samuel Williston, *Treatise on the Law of Contracts* § 63.29 (Richard A. Lord ed., 4th ed.2002).

*UT Med. Grp., Inc. v. Vogt*, 235 S.W.3d 110, 120 (Tenn. 2007). Defendants state that they merely expressed an interest in exploring other paint suppliers, not a total and unqualified refusal to perform. In response, Plaintiff argues that the trial court correctly found anticipatory repudiation because Defendants informed PPG that "they were going to change paint lines. . . ." Defendants also declined a credit check necessary to take over the PPG Contract.

The trial court clearly credited Mr. Harman's and Mr. Leffew's testimony that PPG terminated the PPG Contract only after Defendants announced that they were changing paint suppliers and not because of Plaintiff's failure to obtain prior written consent. This is unsurprising, as Defendants told Mr. Harman that they were going to change paint lines. That was an unequivocal statement. Defendants also declined a credit check. These actions and statements reflect a straightforward intent to stop performing. While PPG sent a letter to Plaintiff informing him that it was terminating the PPG Contract in the wake of his

failure to obtain prior written consent to an attempted assignment of the Business, the trial court found that the precipitating event was Defendants' statement that they wanted to buy paint elsewhere. In other words, Defendants' actions were the initial and primary basis for PPG's actions, despite the contents of the letter. To the extent that Defendants put forward a different timeline and motivation for PPG's decision, the trial court made explicit and implicit credibility determinations to the contrary. We do not disturb the trial court's credibility determinations. In addition, the evidence does not preponderate against the trial court's factual findings. In announcing that they were going to use a different paint supplier, Defendants articulated a total and unqualified refusal to perform their paint-buying obligation. We affirm the trial court's conclusion that Defendants anticipatorily repudiated the APA.

## IV. Attorney's fees under the APA

Defendants argue that the trial court erred in awarding attorney's fees to Plaintiff because Paragraph 16 of the APA authorizes fees only to the "non-breaching party." Defendants assert that, because Plaintiff breached the APA with his false Section 8 warranties, he is ineligible for an award of attorney's fees. Defendants contend further that the trial court improperly tried to amend its findings post-trial to enable Plaintiff to receive an award of attorney's fees despite his breach. Defendants state that, on the contrary, they should prevail in this matter and be awarded their attorney's fees. For his part, Plaintiff argues that he is entitled to attorney's fees because his breach was non-material, whereas Defendants' anticipatory repudiation was the first material breach of the APA.

Tennessee adheres to the "American Rule" regarding attorney's fees. *Eberbach v. Eberbach*, 535 S.W.3d 467, 474 (Tenn. 2017). The American Rule provides that "a party in a civil action may recover attorney's fees only if: (1) a contractual or statutory provision creates a right to recover attorney's fees; or (2) some other recognized exception to the American Rule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). Typically, awards of attorney's fees are within a trial court's discretion, although when a contract mandates such an award, courts lack discretion to deny such an award. *Eberbach*, 535 S.W.3d at 478.

Plaintiff cites a case in which this Court addressed the distinction between material and non-material breaches in the context of attorney's fees. In *Barrentine v. Kinsler*, No. E2023-01274-COA-R3-CV, 2024 WL 3374331 (Tenn. Ct. App. July 11, 2024), we affirmed the trial court's finding that, although the plaintiff had breached the contract at issue, "such breach was not material and the defendant was still obligated to perform his contractual duties." *Id*. at *1. We concluded instead that the first material breach was committed by the defendant. *Id*. at *6. The contract contained a clause providing that "the prevailing party shall be entitled to recover all costs of such enforcement, including reasonable attorney's fees." *Id*. Notwithstanding any non-material breach of contract

committed by the plaintiff, we affirmed the trial court's award of attorney's fees to the plaintiff and granted his request for attorney's fees incurred on appeal. *Id*.

In the appeal at bar, Plaintiff asserts that the trial court correctly found that "any breach of the APA by [Plaintiff] was immaterial" whereas "[Defendants] materially breached the APA and agreed to hold [Plaintiff] harmless from all obligations arising on and after the closing date regarding the PPG Contract," thus he and only he should be awarded attorney's fees. We agree with Plaintiff. The confusion below about which order to enter was regrettable but not in the end decisive. Whether Plaintiff's warranty in the APA as to his authority to convey the PPG Contract is characterized as a breach of contract or not, it was wholly non-material because it caused Defendants absolutely no harm and did not impair their ability to perform. On the other hand, Defendants' repudiation of their paint-buying obligation constituted the first material breach. Since Defendants committed the first material breach of contract, Defendants cannot recover attorney's fees under the APA. Plaintiff, meanwhile, is contractually entitled to an award of attorney's fees. We affirm the trial court in its awarding Plaintiff attorney's fees under the APA and declining to award attorney's fees to Defendants.[6]

## V. Defendants' catch-all issue alleging error by the trial court

Lastly, Defendants argue that the trial court committed various substantive and procedural errors rising to the level of an abuse of discretion requiring reversal or remand. While presented as a distinct issue, we discern this to be a recapitulation of Defendants' earlier arguments, which we found unpersuasive. The trial court committed no abuse of discretion or any other reversible error. We affirm the judgment of the trial court in its entirety.

---

[6] Although we affirm the trial court's award to Plaintiff of attorney's fees incurred below, we note that Plaintiff never asks for appellate attorney's fees. Therefore, we decline to award Plaintiff any attorney's fees incurred on appeal. *See Charles v. McQueen*, 693 S.W.3d 262, 284 (Tenn. 2024) ("[A]n appellee is not required to include the request [for appellate attorney's fees] in the statement of issues[,] [b]ut an appellee is required to present the request to the appellate court by raising it in the body of the brief, adequately developing the argument, and specifying that relief in the brief's conclusion." (Citation omitted)).

## CONCLUSION

The judgment of the Chancery Court for Roane County is hereby affirmed. Costs on appeal are assessed jointly and severally to the appellants, Eddie's Body Shop, LLC, Adam Clark, and Brandon Moore, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE